Filed 3/30/26  Michelle S. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| MICHELLE S., | |
| Petitioner, | E087604 |
| v. | (Super.Ct.No. DPIN2400217) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Elizabeth Tucker, Judge.  Petition denied.

Shannon Goldstein for Petitioner.

No appearance for Respondent.

Minh C. Tran, County Counsel, Jamila T. Purnell, Chief Assistant County Counsel, and Julie Jarvi, Deputy County Counsel, for Real Party in Interest.

1

Michelle S. (Mother) petitions for extraordinary writ review of an order setting a hearing under Welfare and Institutions Code section 366.26 (unlabeled statutory citations refer to this code).  (See Cal. Rules of Court, rule 8.452.)  She challenges the sufficiency of the evidence supporting the court's findings that the Riverside County Department of Public Social Services (DPSS) provided reasonable services, there was no substantial probability that the children would be returned if the matter was continued to the 18-month review hearing, and return of the children to her created a substantial risk of detriment.  We conclude that Mother's arguments lack merit, and we accordingly deny the petition.

BACKGROUND

In October 2024, DPSS received a referral alleging general neglect of Levi D. (then two years old) and P.B. (then one year old) and caretaker absence or incapacity. The children lived with Mother and her boyfriend, who was on parole.  They lived in a recreational vehicle, which was in poor condition, had trash everywhere, and was connected to a makeshift septic line.  The children were in a playpen that did not have a bottom, so they were lying on the floor.  The children "appeared dirty[,] and they ha[d] not bathed in a while."

When the social worker arrived at the property, she spoke with the maternal uncle, who was watching the children while Mother was away.  "There were dozens of flies in the playpen surrounding the children."  The home smelled of garbage that "[had not] been

2

taken out in several weeks." The social worker asked the uncle to change the children's diapers, and he said that "he doesn't change diapers."

The social worker spoke to a family friend who lived in the main house on the property, and the friend said that "[M]other often [left] all day" and could not be reached when she was gone. The family tried to contact Mother, and eventually someone was able to reach her. Mother arrived one hour and 30 minutes after the social worker. Mother declined to drug test.

In October 2024, DPSS filed a petition under subdivisions (b)(1) and (g) of section 300. DPSS alleged Mother had an unresolved history of substance abuse, neglected the children's medical needs, failed to provide them with appropriate supervision, and neglected their health, safety, and well-being.

At the detention hearing, the court detained the children and ordered that Mother have supervised visits at least once per week for two hours.

In November 2024, DPSS filed its jurisdiction and disposition report. Mother reported that previously she was engaged to the children's father, David B. (Father), but she was currently engaged to someone else. Mother and Father had a history of domestic violence with the children present. Mother said that they used methamphetamine "at the same time," and she said that she started using methamphetamine in 2018 after she met Father. She entered treatment in 2019, and she completed parenting classes.

DPSS was unable to interview Father, because he was incarcerated. Phone interviews were not permitted in the prison, and DPSS tried to contact the prison to schedule an in-person visit but was unsuccessful.

Mother was dependent on the maternal grandmother for transportation and could not set up a visitation schedule. DPSS offered Mother bus passes, but she declined them because "there were no buses in her area." On the date originally scheduled for the jurisdiction hearing, the court ordered DPSS to assist Mother with visitation. Mother subsequently told the social worker that visitation "'in Indio would be a lot easier.'" The social worker informed Mother that the travel time for the children would be four hours if the visits were moved there. Mother stated that "it was fine to keep the visits in Banning."

In December 2024, DPSS called Mother and heard a male voice in the background. Mother said that it was Father. He had been released on parole that month. The parents were currently in a relationship, and they had been in an "on and off" relationship for eight years. Father told the social worker that the parents had a history of domestic violence before the children were born. The last domestic violence incident occurred before Father went to prison for the first time. The parents "declined to complete [a] saliva drug test," "and [they] offered to come back the next day" to test.

In the winter of 2024, Mother was diagnosed with posttraumatic stress disorder, borderline personality disorder, auditory hallucinations, and severe depression. She was taking Zoloft, Latuda, and Wellbutrin.

DPSS filed an addendum report in March 2025. DPSS reported that Mother tested positive for methamphetamine on February 24, 2025, but tested negative the next day.

The children's caregiver reported that during one of the parents' visits, someone "smelled like marijuana." The caregiver said that the children run to her when Father says "'go to mom.'" On one occasion, Levi hid under the stroller to get away from the parents. DPSS and the caregiver agreed that she would no longer supervise the parents' visits.

In March 2025, the court found all of the petition's allegations true, removed the children from parental custody, and ordered reunification services for the parents.

According to the six-month review report, Mother and Father were living together in a one-bedroom, one-bathroom recreational vehicle on the maternal grandmother's property. In June 2025, Mother graduated from a substance abuse program. She reported that she had been sober since Christmas of 2024. She was on step 10 of her 12-step program. She tested negative for all substances in a hair follicle test. She took 66 urinalysis drug tests since entering her program, tested negative for all substances, and did not miss any tests. Mother attended therapy once per week, and she reported that therapy helped her heal from trauma. Mother also completed a parenting program in March 2025, and she was also enrolled in another parenting program to "gain more parenting skills."

In April 2025, Father tested positive for amphetamine and methamphetamine. In May 2025, Father tested positive for buprenorphine, but Father denied using any

substances. He was assessed for individual therapy and deemed not to need services. He completed a parenting program in June 2025. That month, he stopped visiting the children in person because of "work commitments," and he became inconsistent with video visits.

Mother had video visits with the children during the week, and she had two-hour supervised visits in Banning once per week. Mother consistently attended visits and "miss[ed] only one due to illness." She "always provide[d] the children with two big bags of toys and snacks." She engaged the children through play. DPSS had some concerns that Mother did not correct some of the children's behavior, so DPSS changed the visit location to better assess visits. The in-person visits alternated between DPSS's office and a McDonald's play area. The social workers "consistently observed [Mother] interacting appropriately with the children."

At the six-month review hearing in September 2025, the court ordered that family reunification services continue for the parents. The court ordered Father to participate in a hair follicle test and a new substance abuse assessment.

According to the 12-month review report, DPSS approved Mother for unsupervised visits in September 2025. She had weekly unsupervised visits at a McDonald's in Banning, and the maternal grandmother drove Mother there.

In October 2025, Mother's counselor left her treatment program. Mother reported that "she has been assigned a new counselor named 'Stephanie,' but at this time has not been scheduled for her first session with her." Mother said "that she would be happy

when she could start counseling again," and she continued to progress through the family preservation court treatment program. Mother tested negative for all substances, and she was on track to graduate from the program in December 2025 or January 2026.

In October 2025, the social worker tried to contact Father and asked that he respond to set up a meeting. The social worker asked him to contact her so that they could discuss the case, but Father did not respond. Father had not visited the children in person for several months.

Also in October 2025, Father tested positive for methamphetamine. He recently started a substance abuse program. He "reported that he did not think he had a problem, and he had already been through a substance use treatment program while in prison." Father had not been participating in hair follicle testing.

In November 2025, the caregiver contacted the social worker and explained that her husband had taken the children to visit Mother the previous day. When he dropped them off, they cried and did not want to stay. When he left, only Mother and the maternal grandmother were at the visit. When he returned, Father was there too. The caregivers were concerned because they thought that Father was allowed only supervised visits. The husband thought that Father looked like he was "'high and strung out on something.'"

When the social worker asked Mother if Father was present at a visit, she confirmed that he was there. The social worker told her that Father had not been in contact with DPSS for a while and had not asked for visits. The social worker explained to Mother that Father was not permitted to have unsupervised visits. Less than two

7

weeks later, Mother's visits reverted to supervised for three hours per week, and the maternal grandmother was approved to supervise the visits.

On November 17, 2025, Mother reported that she was no longer in a relationship with Father and that he had moved out. Four days later, Mother informed the social worker that Father was no longer allowed on the property. She had applied for a restraining order against him. In the restraining order request, Mother indicated that on November 21, 2025, Father "'showed up with a random chick,'" and Mother asked him to leave. "[H]e became verbally and physically abusive with her, and [he] threatened her."

On December 3, 2025, Mother also informed the social worker that she had been assigned a new counselor, "Stephanie Guzman, ASW," and her first session was that day. She was progressing in the family preservation court program and testing negative. On December 15, 2025, Mother reported that she had graduated from the program and that her restraining order request was granted.

The social worker learned that Father had been discharged from his outpatient substance abuse program because of excessive absences. While in the program, he had six scheduled drug tests. He tested positive once and missed the other five tests.

At the contested 12-month review hearing, the court found that DPSS had provided reasonable services. The court found that returning the children to the parents would create a substantial risk of detriment to the children's safety, protection, or physical or emotional well-being. The court found by clear and convincing evidence that

8

the parents had failed to participate regularly and make substantive progress in their court-ordered treatment plans, and there was no substantial probability that the children would be returned if the parents were given another six months of services. The court then terminated reunification services and set a hearing under section 366.26.

DISCUSSION

I.    *Reasonable services*

Mother argues that the court erred by finding that DPSS provided her with reasonable services. Her arguments lack merit.

At the 12-month review hearing, the court may continue reunification services to the 18-month review under limited circumstances: The court must find a substantial probability that the child will be returned to the parent's custody within the extended time period, or it must find that reasonable services have not been provided to the parent. (§§ 361.5, subd. (a)(3)(A); 366.21, subd. (g)(1).) Thus, the parent bears the burden of showing that the services provided were not reasonable. "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

When the juvenile court determines that the parent failed to carry their burden of proof, we ask "'whether the evidence compels a finding in favor of the appellant as a matter of law,' that is, whether the evidence supporting [the parent's] position 'was (1)

9

"uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*In re Raul V.* (2022) 82 Cal.App.5th 290, 301 (*Raul V.*).)

First, Mother argues that she did not receive reasonable reunification services because her initial counselor's departure in October 2025 created a "standstill" in her counseling for "almost two months before [she] was assigned a new counselor." Mother frames the issue as a challenge to the sufficiency of the evidence supporting the court's finding that she received reasonable services. But "'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' [Citation.] Rather, 'the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law.'" (*Raul V.*, *supra*, 82 Cal.App.5th at pp. 300-301)

Mother's argument fails because it is not supported by the record. In October 2025, at the same time that Mother informed DPSS of her counselor's departure, she also informed DPSS that she was assigned a new counselor, "'Stephanie,'" but had not yet scheduled an appointment. When contacted on December 3, 2025, Mother repeated the information that she was assigned a new counselor, "Stephanie Guzman, ASW," and reported that she had her first session that day. The record contains no evidence that after Mother's original counselor left the program in October and a new counselor named Stephanie was assigned to Mother at that time, the new counselor too left the program and a third counselor, coincidentally also named Stephanie, was assigned to Mother in

10

December.  Rather, the reasonable inference from the record is that when Mother's original counselor left the program in October, Mother was immediately assigned a new counselor but did not schedule an appointment until December 3.  The record contains no evidence that DPSS could have done anything about the scheduling delay or had reason to believe that there was a problem (if there was one).  Moreover, Mother had been in her counseling program for approximately 10 months when her counselor left in October 2025.  Any delay in scheduling Mother's next counseling appointment apparently did not affect her progress in the program, from which she graduated in mid-December.  For all of these reasons, Mother's argument fails to show that the record compels a finding that services were not reasonable.

Mother also argues that DPSS did not provide her with reasonable services because her case plan should have included services for domestic violence.  She argues that because Mother and Father "wanted to sta[y] together as a family," "it was incumbent on [DPSS] to structure a case plan" that included a "domestic violence component" after the parents reported a history of domestic violence.  Mother did not raise the issue in the trial court, so the argument is forfeited.  (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846.)  Even if she had not forfeited the argument, we would reject it.  The basis for the trial court's removal of the children was not domestic violence.  The parents reunited after Father was released from prison, and they were together throughout most of the case:  The petition was filed in October 2024, and Father was paroled in December 2024 and resumed living with Mother at that time.  There was no evidence of a

11

current domestic violence issue until November 2025, when Father showed up to Mother's home and "became verbally and physically abusive with her." And then Mother addressed the issue by kicking Father out and obtaining a restraining order against him. DPSS's failure to provide services to address a seemingly nonexistent problem does not compel a finding that services were not reasonable.

Moreover, Mother's complaints about the case plan are misguided. The case plan is ordered by the court at disposition (§ 361.5, subd. (a)), and it is reviewed by the court at the six-month review hearing (§ 366.21, subd. (e)(2)). If Mother thought that her case plan should have included services to address domestic violence, she could have asked the court for the services at the disposition hearing or the six-month review hearing, and she could have appealed if her request was rejected. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 47.)

Because Mother did not ask the court to add domestic violence services to her case plan, the most that she can argue now concerning the case plan is that it was unreasonable for DPSS not to recommend at disposition and/or at the six-month review that domestic violence services be included in the case plan. But that argument fails for the reasons already given: It was reasonable for DPSS not to recommend that services for domestic violence be included in the case plan, because there was no evidence of a current domestic violence issue. Indeed, had DPSS recommended that domestic violence services be included in the case plan at either disposition or the six-month review, Mother

likely would have opposed the recommendation as unsupported by the evidence, and her point would have been well taken.

Mother also argues that services were unreasonable because "visitation is an essential component of any reunification plan." Because Mother did not raise the issue in the trial court (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222) and has failed to develop the argument on appeal (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956), the issue is forfeited. Moreover, at the hearing at which Mother's reunification services were terminated, Mother argued that she "has had regular visits," which "have always gone very, very well." The record does not compel the conclusion that DPSS failed to facilitate adequate visitation and thereby failed to provide reasonable services.

II.     *Termination of reunification services*

Mother argues that the court erred by terminating her reunification services because (1) the finding that she failed to make substantive progress in her case plan is not supported by sufficient evidence, and (2) there was a substantial probability that the children would be returned if her services were continued to the 18-month review. The arguments lack merit.

The first argument fails because, as DPSS points out, the juvenile court's finding concerning Mother's progress in her case plan was superfluous. A finding that the parent has failed to participate regularly and make substantive progress in their case plan is required in order to terminate reunification services at the six-month review. (§ 366.21,

13

subd. (e)(3).)  But Mother's services were terminated at the 12-month review, and at that hearing the court is required to terminate services unless "it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . within the extended time period, or that reasonable services have not been provided to the parent."  (§ 361.5, subd. (a)(3)(A); see § 366.21, subd. (g)(1).)  No finding that Mother failed to participate or make progress in her case plan was required, so any error in making such a finding was harmless.

The second argument fails because the evidence does not compel a finding of a substantial probability that the children would be returned to Mother by the 18-month review if services were continued.  (See *Raul V.*, *supra*, 82 Cal.App.5th at p. 301.)  The court detained the children in October 2024, which was 15 months before the contested 12-month review hearing.  Thus, there would have been approximately three months available to Mother to show that the children would be safely returned to her care if services were continued.

The parents had been in an on-and-off relationship for eight years.  Mother told the social worker that she started to use methamphetamine after she met Father.  Father had a long-standing and completely unaddressed substance abuse issue, and he tested positive for methamphetamine in October 2025.  He failed to participate in a hair follicle test, and Mother allowed him to attend one of her unsupervised visits the following month.  He appeared to be "'high and strung out on something'" at the visit.  Mother subsequently kicked Father out and obtained a restraining order against him, following an altercation

14

when he "'showed up with a random chick.'" But given the parents' history of breaking up and reconciling, it was reasonable for the juvenile court to infer that pattern would continue.

For all of the foregoing reasons, it was reasonable for the juvenile court to infer that Mother was likely to reunite with the Father again, which would make it unlikely that the children could be returned to her, because they would be at risk of harm from Father's substance abuse and because Father's presence would greatly increase Mother's risk of relapse. Consequently, the evidence did not compel a finding that there was a substantial probability that the children would be returned to Mother in the remaining three months before the 18-month review.

III.    *Substantial risk of detriment*

Mother argues that the court's finding that there was a substantial risk of detriment to the children if they were returned to her care was not supported by substantial evidence. We disagree.

At the 12-month review hearing, "the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.21, subd. (f)(1).) We review the juvenile court's detriment finding for substantial evidence. (*In re A.J.* (2015) 239 Cal.App.4th 154, 160.)

15

For reasons already described, the evidence supports the court's finding. Father had a long-standing and completely unaddressed substance abuse issue, and there was evidence that he was the original source of Mother's substance abuse. Moreover, the parents had an eight-year history of separating and reuniting, and they were together during almost the entire reunification period. It was reasonable for the court to infer that Mother was likely to reunite with Father again, which would put the children at risk of harm from Father's substance abuse, and his presence would greatly increase Mother's likelihood of relapse, further placing them at risk of harm. The record thus contains substantial evidence that return of the children to Mother's custody would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being.

## DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

RAMIREZ

P. J.

FIELDS

J.